# Sterling *against* Brightbill.

Upon the sale of the real estate of one of two partners, and the appropriation of the proceeds to the payment of a judgment against both, a subsequent judgment creditor of that partner whose separate estate was sold, is not entitled to be substituted as plaintiff in the judgment to which the money was appropriated, so as to enable him to proceed against the other partner, unless it shall have been made to appear, that he whose separate property was sold, was, at the time, the creditor partner of the firm.

ERROR to the common pleas of *Dauphin* county.

This was an issue directed by the court, to try the right of the respective claimants to the proceeds of the sale of the real estate of David Ferguson and John Ritchey, by the sheriff.

The real estate of David Ferguson was sold upon a judgment of Hummel & Lebkicher, which was the first and only judgment against Ferguson, and which was therefore indisputably payable.   The contest was about the balance of the money.   After Hummel & Lebkicher obtained their judgment, Ferguson sold and conveyed the land to John Elder, after which, on the 29th of October 1825, the Harrisburg bank obtained a judgment against John Ritchey and John Elder, upon a note drawn by Ritchey and endorsed by Elder for 8000 dollars.   Ritchey and Elder were partners in trade at the time, and the debt to the bank was a partnership debt.   John Ritchey's

real estate was also sold upon the judgment of the Harrisburg bank; and that judgment being the first lien, the money was appropriated to it. On the 24th of January 1827, Jacob Brightbill obtained a lien against the real estate of John Ritchey, upon a transcript of his guardianship account, settled in the orphans' court; and upon the payment of the proceeds of his real estate to the Harrisburg bank, Brightbill asked to be substituted as plaintiff in the bank judgment, so as to give him a right to claim on it from John Elder. This was opposed by others claiming, under John Elder, the property upon which the bank judgment had been a lien. There was no evidence given as to the state of the partnership accounts between Elder and Ritchey; or which was creditor of the other. The court directed the jury that Brightbill was entitled to be substituted; and this was the error assigned.

*M'Clure*, for plaintiff in error, cited Miller *v.* Jacobs, 3 *Watts* 477; Goswiler's Appeal, 3 *Penns. Rep.* 200; Greiner's Estate, 2 *Watts* 414; 1 *Madd. Chan.* 203; 17 *Vez.* 527; Evans *v.* Duncan, 4 *Watts* 24; 1 *Hen. Eq.* 320.

*Alricks*, contra, cited Torr's Estate, 2 *Rawle* 252; M'Call *v.* Lenox, 9 *Serg. & Rawle* 309; Cheesbrough *v.* Millard, 1 *Johns. Ch. Rep.* 412; Campbell *v.* Mesier, 4 *Ibid.* 335; Dorr *v.* Shaw, 4 *Ibid.* 17; 1 *Stor. Eq.* 588, 482; Ramsey's Appeal, 2 *Watts* 228; Evertson *v.* Booth, 19 *Johns.* 486; Bank of Pennsylvania *v.* Winger, 1 *Rawle* 302.

The opinion of the Court was delivered by

KENNEDY, J.—If this were the ordinary case, where the first of two or more judgment or other lien creditors of the *same person*, having two funds from which he may satisfy his debt, and the others being posterior in point of time, having only one of the funds within their reach, the court might interfere, so as to give the junior creditors the benefit of the security of the first, upon their paying him the amount thereof, and permit them to use it against that fund, upon which they had no claim under their own securities, for the purpose of rendering all effective. But that is not this case, it is of a more complex character. The first judgment creditor here is the creditor of two persons, who stood upon the record as his joint debtors, both owning separate real estates at the time of the rendition of the judgment, which became bound by it; and the other creditors are, some of them, the separate creditors of one only of these two debtors, and the rest of the other. In the ordinary case first mentioned, there being but one and the same debtor, he, of course, stands in the same relative situation to each of his creditors; their claims are alike just as against him, and it can make no difference to him how the funds are marshalled in their application to the payment of his debts. He can have no good reason to object to them,

[Sterling v. Brightbill.]

who are posterior in point of time, being subrogated to the rights of the first for the purpose of obtaining payment of their claims. But it is obvious, that where the second fund, which the first creditor has for the payment of his debt, is the estate of a second person, who is not the debtor of the one claiming to be subrogated to the rights of the first creditor, that this second person may have rights which would render it very unjust and inequitable to make the substitution. For instance, if he be only a surety, what could be more unjust? A surety, in this respect, has claim to great favour; and, instead of allowing the security to be used to his prejudice, courts, upon his paying the debt, will permit him to have and to use all the securities which the creditor held against his principal, for the purpose of reimbursing himself. He is entitled to a preference as regards the right of subrogation; and against him, I apprehend, no such right can be given or exercised in favour of any subsequent creditor of his principal.

The Harrisburg Bank had the first lien here under this judgment against John Ritchey and John Elder jointly as partners; but for the debt coming to Jacob Brightbill, in right of his wife, who now claims to be subrogated to the rights of the bank, John Elder is in no respect liable. It is the proper debt of Ritchey alone: and without ascertaining whether Elder may not be a creditor of the estate of Ritchey to an equal or greater amount than the one half of the debt paid the bank by Ritchey's estate, it is manifest that great injustice might be done to Elder by making his estate liable to the payment of Ritchey's debt. The principle of equity which the counsel of Brightbill here invokes, though well settled, "must be employed," as is said by Mr Justice Sergeant, very correctly in Ziegler *v.* Long, 2 *Watts* 206, "like all other rules of equity to the attainment of justice; it is not to be used to overthrow the equity of another person, and thus work injustice." Now, it must be observed, that neither Elder nor Ritchey's personal representatives are parties to or notified of this proceeding, though it may be said that Elder's assignee is; but to make the subrogation asked for, would not only affect the rights of the assignee, but those likewise of Elder himself. Neither was there any evidence adduced, showing what interest each had in the partnership, whether they were equal or not; or that there ever was a settlement between them of their partnership accounts, in which it was found that they were even, or that there was no balance due from Ritchey to Elder. There being no evidence to this effect, it seems to have been considered by the court below, that in the absence of all such evidence, it ought to be intended that their interests in the partnership were equal; and that, anterior to the payment of the bank debt out of the estate of Ritchey, there was no indebtedness of the one to the other, and that Elder, thereby, became debtor to the estate of Ritchey for one half of the debt so paid. It is possible that the court may have been led into this notion from what Chancellor Kent, in speaking on this subject,

said in the case of Sells *v.* The Administrators of Hubbell, 2 *Johns.*
*Ch. Rep.* 397. He there says, " the estate of each partner ought to be
charged with the debt in equal portions, *provided their interests in*
*the partnership were equal.* *This is the intendment in the first*
*instance;* and it would be a thing almost of course for equity to
allow the representatives of the deceased partner, who had to pay
the whole debt, to be substituted in place of the creditor, in order to
receive from the surviving partner, or his estate, a *moiety* of what
they had paid. Nothing could stay this proceeding but the allega-
tion of the surviving partner that he was the creditor partner, and
that the estate of the second partner owed him a balance, as much or
more than that it had been obliged to pay. This would render it
requisite to take and state an account between the partners, before
the court could interfere in any way to enforce the claim for con-
tribution." But the chancellor does not go so far as to say, that, in
the absence of evidence showing their respective interest in the part-
nership, they are to be presumed to be equal; but would rather
seem to say that where this is *made to appear*, it shall be intended
in the first instance that they ought to be charged with the debt in
equal portions. This point, however, was not before the chancellor
in such a way as to require a decision from him on it; and it, there-
fore, may be, that, if it had been necessary for him to have adjudi-
cated upon it, he, upon applying his mind more closely to *it*, would
have come to a different conclusion. For in a subsequent case of
Dorr *v.* Shaw, 4 *Johns. Ch. Rep.* 17, where a bill was filed by a subse-
quent judgment creditor of D. S. alone, against a prior judgment cre-
ditor of D. S. and P. S. jointly, to compel the defendant, who had
sued out execution upon his judgment, and levied on the separate
real estate of D. S., P. S. being the separate owner of real estate also
bound by the judgment, which the defendant subsequently to his
judgment bought of P. S., either to cease all proceedings upon his
judgment and execution, or to assign the same to the plaintiff, on
being paid the debt, interest and costs. Chancellor Kent dismissed
the bill because it was not shown positively and distinctly that P. S.
ought to pay the debt ; yet I do not see why it might not have been
said, at least with equal propriety, in this last case, in the absence of
proof showing the contrary, that as the record of the judgment
showed the debt to be owing by them as joint debtors, without ma-
king any distinction between them, it was to be intended in the first
instance that it ought to be paid by them in equal portions. The
chancellor, however, thought otherwise, and accordingly decided,
that as the plaintiff claimed to be preferred upon principles of equity
and benevolence, he ought to show clearly and positively that he was
entitled to it upon grounds that left no room for raising objections
against it, founded, as it would seem, even upon conjecture. His
language in illustration of the principle which governed his decision
is very applicable to the present case. He says, " if both judgments
had been against D. S. only, the rule that the prior creditor must be

thrown first on the fund, not reached by the second judgment, might be applied. But here we have no means of knowing whether A or B ought to pay the debt; and *it might be unjust,* as between these two original debtors, if the court should interfere and charge the debt upon one of them instead of the other. They *are not before us,* and we *have nothing in the cause* to guide us in making a selection between them. *The consequence is,* that we cannot interfere in the case." He then refers to the opinion of lord Eldon in ex-parte Kendal, 17 *Ves.* 520, which he recites seemingly with entire approbation, who says, " We have gone this length, if A has a right to go upon two funds, and B upon one, of the *same debtor,* and the funds are the *property* of the *same person,* A shall take payment from that fund, to which he can resort exclusively, so that both may be paid. But it was never said that if I have a demand against A and B, a creditor of B shall compel me to seek payment from A, if not founded in some equity *giving B for his own sake,* as if he was a surety, &c. a right to compel me to seek payment of A. *It must be established, that it is just and equitable that A ought to pay in the first instance,* or there is no equity to compel a man to go against A who has resort to both funds." According to the principles laid down in these cases, which certainly commend themselves strongly to every discerning mind for their adaptation to promote mutual justice, it ought to have been shown beyond doubt, that the estate of Ritchey had a right to go upon the estate of Elder for one half of the money paid out of it to the bank. But this could only have been shown by proving in the first place, that Elder and Ritchey were equal partners in their joint concern, " for the benefit of which the debt was created." And then, in the second place, that upon a final settlement of their partnership and other accounts, Elder was indebted to Ritchey or his estate: or that there was nothing due from the latter to the former when the estate of the latter paid the bank debt. No evidence, however, was offered as to either of these facts, but the affirmative would seem to have been presumed by the court in both instances. This, we think, was not sufficient to justify the court in coming to the conclusion, that Elder, from the state of the accounts as betweeen him and Ritchey's estate, was bound to pay one half of the amount of the debt paid to the bank. That there ought to have been satisfactory and positive evidence adduced, establishing this latter fact beyond doubt, is deducible from legal analogy as well as from the nature of the thing itself. From the principles already laid down, it is perfectly certain, that unless Ritchey's estate had the right to claim contribution from Elder, and presented itself in such a point of view as to show clearly that the right existed, Brightbill can have no claim as the creditor of Ritchey's estate; for it is only in right of Ritchey that he can pretend to claim contribution. But the money paid to the bank out of Ritchey's estate was paid in discharge of a partnership debt, owing by Ritchey and Elder as such to the bank, and without a previous settlement

v.—2 E

of the partnership account, showing that this bank debt ought to have been paid by Ritchey and Elder in equal portions; Ritchey, if he were living and had paid the debt, could not ~~not~~ claim to have contribution allowed him in the manner it was here. His only remedy would be by an action of account render against Elder ; in which all their partnership accounts would have to be brought into view, and to be stated and settled by auditors appointed for that purpose; by whom each of the parties might be compelled to answer interrogatories, upon oath or affirmation, in regard to matters of fact appertaining thereto; and unless it appeared upon such settlement, taking the money paid the bank into the account, that Elder was indebted to Ritchey, the latter could pretend to no right to contribution. Again, were Ritchey living, it cannot be questioned but a previous settlement of their partnership accounts made in some way, either amicably or otherwise, showing a balance struck in favour of Ritchey, and that Elder was his debtor, would be indispensably necessary, in order to establish that he was entitled to contribution. Even to enable him to maintain an action of assumpsit to recover it, this at least would be requisite. This is well settled by abundance of authority, which seems to prove pretty conclusively, that no intendment or presumption can or ought to be made in his favour, from the mere circumstance of the money's having been paid in discharge of a partnership debt, for the purpose of giving him a right to demand contribution. This doctrine has been established with a view to protect the partner, against whom the claim is made for contribution, from paying, unless upon the principle of equalizing their profit and loss according to their respective interests in the partnership, it shall appear that he is bound to do so. This being the case as against Ritchey himself were he alive, there is not even the shadow of reason why his representatives, or any one of his creditors, should be placed on a more favourable footing. We, therefore, think that Brightbill did not show himself entitled to claim any portion of the money arising from the sale of the land sold as the property of Elder. But that the residue of the money remaining after satisfying Hummel & Libkecher's judgment against Daniel Ferguson, subject to the lien of which Elder became the owner of the land, must be appropriated towards paying the judgment of Sterling *v.* Elder; and if any surplus should remain, then it is to be paid to Alexander M. Piper, who purchased the land of Elder, and to whom the latter assigned it subject to those claims, directed to be satisfied first out of the money arising from the sheriff's sale.

Judgment reversed.